STATE OF NEW JERSEY, PLANTIFF-RESPONDENT, v. JOHN ANTHONY SINNOTT, DEFENDANT-APPELLANT.

Argued April 29, 1957—Decided June 3, 1957.

410

*Mr. Ira D. Dorian* argued the cause for appellant (*Mr. Matthew Grayson,* attorney).

*Mr. Hyman Isaac* argued the cause for the State (*Mr. H. Russell Morss, Jr.,* Union County Prosecutor, attorney).

The opinion of the court was delivered by

WACHENFELD, J.    The appellant was indicted by the Union County grand jury for the crime of sodomy involving a male child under the age of 16 years.    *N. J. S.* 2A:143–2.

His conviction was sustained by the Appellate Division. On petition, we granted certification.    23 *N. J.* 303.

The sordid details involved need not be further narrated except as required for the disposal of the various issues presented.    We note with approval the meticulous consideration given the matter by the Appellate Division because the revolting nature of the crime ordinarily has a tendency to prejudice a defendant in his quest for justice.    The circumstances likewise direct us to be scrupulously fair in determining whether any fundamental rights have been violated.

The appellant contends the trial court committed prejudicial error in admitting testimony as to an extraneous crime; in admitting prophylactics, toy whistles and a wine bottle into evidence; in refusing to permit defendant's counsel to read to the jury pertinent parts of exhibits in evidence; and in refusing to permit the defendant to testify as to his marital and familial status.    It is also insisted that the remarks of the prosecutor in his summation impaired the defendant's substantial rights, and that the verdict was the result of mistake, as shown by markings on exhibits returned by the jury after their verdict, and was against the weight of the evidence.

These various points, we are satisfied, are submitted primarily to bolster the appellant's principal contention, which is that the trial court committed prejudicial error in refusing to permit the appellant's psychiatric witness to give an expert opinion, predicated in part on an examination of the appellant while under the influence of sodium pentothal, the so-called "truth serum," to the effect that the defendant was not a sexual deviate and had no inherent traits of perversion.

## I.

The indictment under consideration charged the appellant with an act of sodomy committed upon Robert.

At the trial Robert testified that immediately prior to the commission of the offense one Edward was present in the attic of the school where it allegedly took place and that Edward received like treatment from the appellant. Edward then testified to the acts committed upon him, although he was not named in the indictment on trial but in a separate instrument.

The appellant alleges error, contending that on the trial of a person for one crime, evidence that he was guilty of other crimes, even of a like nature, is irrelevant and inadmissible. *E. g., State v. DePaola,* 5 *N. J.* 1 (1950); *State v. Julius,* 3 *N. J. Misc.* 202 (*Sup. Ct.* 1925); *State v. Fisher,* 96 *N. J. L.* 5 (*Sup. Ct.* 1921); *State v. Bloom,* 89 *N. J. L.* 418 (*Sup. Ct.* 1916); *State v. Raymond,* 53 *N. J. L.* 260 (*Sup. Ct.* 1891). *Cf. State v. Bartell,* 15 *N. J. Super.* 450 (*App. Div.* 1951), affirmed 10 *N. J.* 9 (1952).

The reasoning based on the cases cited, however, overlooks the fact that a defendant's declarations and acts are admissible when they are part of the *res gestae. Cf. State v. Stephan,* 118 *N. J. L.* 592 (*E. & A.* 1937); *Hunter v. State,* 40 *N. J. L.* 495 (*E. & A.* 1878).

When the evidence of another crime tends to prove logically against the defendant some element of the crime for which he was tried, *cf. State v. DePaola, supra,* or where the evidence of another crime tends to show malice, ill will or intent on the part of the actor, *State v. Donahue,* 2 *N. J.* 381 (1949), or where a common scheme or plan embodies the commission of two or more crimes so related that proof of one tends to establish the other, *State v. Noel,* 102 *N. J. L.* 659 (*E. & A.* 1926); *State v. DePaola, supra; State v. Donahue, supra,* it becomes admissible.

It is equally well settled that where the commission of a former crime evinces a state of mind that is carried

forward and is shown to exist at the time of the commission
of the crime charged, and the former crime is so related to
the crime charged as to time, place and circumstances that
the state of mind may be said to be continuous, evidence of
the former crime is admissible. *State v. Roscus,* 16 *N. J.*
415 (1954); *State v. McNamara,* 116 *N. J. L.* 497 (*E. & A.*
1935), *certiorari* denied 299 *U. S.* 568, 57 *S. Ct.* 32, 81 *L. Ed.*
419 (1936); *State v. Ehlers,* 98 *N. J. L.* 236 (*E. & A.*
1922); *State v. DeLiso,* 75 *N. J. L.* 808 (*E. & A.* 1908).

■ We think the appellant cannot now as a matter of
right contend that the admission of such evidence was error,
inasmuch as counsel at no time objected to any of the
questions asked the witness Edward with reference to his
relations with the defendant, nor did he request that any
instructions in reference thereto be given to the jury. *State
v. Rhams,* 14 *N. J.* 282 (1954). We have nevertheless given
defendant a full right to review and have considered the
points raised on their merits.

## II.

Two months after the acts alleged in the indictment, the
police, through a forced entry into the appellant's workshop
at the school where he was a custodian, found prophylactics
and numerous toy whistles in separate drawers of appellant's
work bench. These items were offered and admitted into
evidence. The appellant denied ownership of the prophy-
lactics in question and stated they were present in the shop
when he started working there. The whistles, he said, were
to give to children who from time to time assisted him in
moving chairs.

It is insisted these articles were completely irrelevant and
inadmissible, and in no wise connected with the indictment
laid against the appellant. This is proved, the appellant
insists, because the court struck them out during its charge
and instructed the jury to pay no attention to them and
did not permit them to be taken to the jury room.

■ Assuming error under the circumstances, we are
satisfied the defect was cured when the items were stricken

from evidence and the jury instructed to disregard them. The record shows no objection to their admission into evidence and there was no request to charge with reference to them by the defense, the appellant in this regard apparently being satisfied with the disposition made by the trial court.

██ Physical evidence found in the possession and control of a defendant in a criminal case may be received into evidence, subject to the usual rules of relevancy, materiality and competency, the same as testimonial or other evidence. *State v. Grillo*, 11 *N. J.* 173 (1952); *State v. Unger*, 103 *N. J. L.* 18 (*Sup. Ct.* 1926), affirmed 104 *N. J. L.* 448 (*E. & A.* 1928); *State v. Hill*, 65 *N. J. L.* 626 (*E. & A.* 1900).

██ Robert testified each of the boys had been given wine taken from a bottle bearing the label "Gold Medal," and an empty wine bottle having a like label, which was found upon the school premises in a trash container in the boiler room, was admitted into evidence. Again there was no objection to its admission and there was a full, vigorous cross-examination in reference to it which almost destroyed its evidential value. Counsel made no application to the court to exclude the bottle in question from the jury's consideration, apparently being satisfied with the results obtained by the cross-examination, and we have difficulty in discerning reversible error for the reasons assigned. Under these circumstances, the appellant customarily would not now be heard to complain that his substantial rights were affected. *State v. Picciotti*, 12 *N. J.* 205 (1953); *Roberts Electric, Inc., v. Foundation & Excavation Co.*, 5 *N. J.* 426 (1950); *State v. Schmieder*, 5 *N. J.* 40 (1950). Considering the question upon its merits, we reach a like result and find no error.

### III.

██ The weather played a part in the prosecution, as both boys testified it was rain which caused them to discontinue playing basketball outdoors and to go inside where they met the appellant.

To refute this testimony the defense entered United States Weather Bureau reports for the period in question. After these were admitted, defense counsel sought to read from them and was restrained from doing so by the trial court.

The trial judge had previously stated he would allow defense counsel to procure an expert to interpret the reports, which are rather complicated. This offer was not availed of, and the opposing attorneys agreed to submit the reports under a stipulation as to what they revealed and for any value the jury could derive from them. It is not clear from the record whether or not any stipulation as to the specific contents of the reports was communicated to the jury.

As the Appellate Division pointed out, this ruling was discretionary, and counsel for the appellant fully and freely discussed the reports in his summation to the jury and was not limited in any of his remarks or comments.

The original difficulty seems to have been encountered not in the defendant's reading the exhibit but in what was characterized as an endeavor to interpret the reports. In view of the unlimited right to comment in his summation to the jury, we see nothing so substantially prejudicial as to require a new trial.

## IV.

When the appellant took the stand, he was asked if he were married and how many children he had. The State's objection to both questions was sustained by the trial court.

Basically this was error. The appellant had a right to show his marital status and his family relationship. It was a natural development in the case which should have been permitted without restriction. If *State v. Randle,* 128 *N. J. L.* 496 (*Sup. Ct.* 1942), is contrary to this view, it is overruled in that regard.

The record, however, shows the appellant answered that he was married before the objection was sustained, and the answer was not stricken from the record. It also appears that his son subsequently testified, without objection, in his

father's defense. We have difficulty, therefore, in determining that the error was so prejudicial under these circumstances as to warrant us in granting a new trial. We must conclude from the entire record that the jury was fully cognizant of appellant's marital and familial status.

## V.

It is said the prosecutor in his summation prejudicially referred to exhibits not properly in evidence, but this was before they had been removed by the court's own motion and while they were part of the record. It is also insisted the prosecutor made statements of fact and alluded to irrelevant matters which were primarily calculated to arouse the passions and interfere with the reasoned judgment of the jury.

The record does not support this contention. For the proper administration of justice, it is necessary that counsel for the State be given considerable latitude as long as he stays within the evidence submitted and confines himself to what has been competently proven upon the record. We have not hesitated to reverse where the prosecutor's conduct went beyond the boundaries established by our adjudications, and we have repeatedly declared that he must consistently refrain from any conduct which is lacking in the essentials of fair play. *State v. Landeros,* 20 *N. J.* 69 (1955); *State v. D'Ippolito,* 19 *N. J.* 540 (1955).

Here, however, his summation, even though it included Biblical references and fictional characters for the purpose of emphasis, was within the boundaries of fairness as already defined. *State v. Rios,* 17 *N. J.* 572 (1955); *State v. Bogen,* 13 *N. J.* 137 (1953); *State v. Vaszorich,* 13 *N. J.* 99 (1953).

## VI.

The Weather Bureau reports of the United States Department of Commerce were marked into evidence and parts of them were later checked in pencil by one of the jurors.

From these markings, counsel argues the jury must have acted under a mistaken interpretation of the reports, which would not have occurred had the trial court permitted defense counsel to read the reports after they went into evidence.

This point is intimately related to a matter already considered, the reasoning on which seems applicable and dispositive of the issue here raised.

Nevertheless, we have reviewed the markings and do not think they necessarily indicate any confusion among the jurors as to the significance of the reports. Each report uses the letter "T" to mean two different things: "Thunderstorm" or precipitation in an "amount too small to measure." The meaning depends on the column in which such symbol is used. One or more of the jurors drew an arrow unmistakably pointing directly to the definition of "T" as "an amount too small to measure." Obviously, the jurors were cognizant of this meaning of "T," and the report clearly states in what columns it is to apply. Thus, they could have accurately determined whether or not it had rained on a certain day covered by the reports.

## VII.

It is urged the verdict be set aside as against the weight of the evidence.

[13, 14] The responsibility for determining the guilt or innocence of a defendant lies primarily with the jury and our review is restricted to a correction of any injustice resulting from the obvious failure of the jury to perform its basic function. The issue of credibility is customarily for the jury and not for us. Unless the record shows the result was one of mistake, partiality, prejudice or passion on the part of the jury, its verdict should not be disturbed by us. *State v. Haines*, 18 *N. J.* 550 (1955).

The two boys were subjected to a long, vigorous and extensive cross-examination which did not noticeably lessen the worth of their statements. The investigation and prose-

cution were originally instigated by the police authorities and not by any apparently hostile witness. The oral testimony was supplemented by corroborative circumstances and events, and we can find nothing in the record which would warrant substituting our conclusions for the verdict reached by the trial jury. A thorough perusal of the entire record and a calm and dispassionate reassessment of the evidence bring us into accord with the jury's verdict.

## VIII.

We now come to the pith of this appeal, which is the appellant's contention that the expert psychiatric evidence offered in his behalf was erroneously rejected by the trial court.

The psychiatrist employed by the defense was a licensed physician who at the time of trial had been practicing in the State of New Jersey for 14 years and had devoted the last ten years to the specialties of neurology and psychiatry. He testified that on many occasions he had examined and treated sexual perverts. His competency as an expert in the field of psychiatry was not disputed. In order to eliminate any possibility of misapprehension as to the ground for his ruling, the trial judge expressly stated: "I base my ruling on the fact that he in my opinion is a qualified psychiatrist."

As a foundation for the doctor's expert testimony relating to the disposition or traits of Sinnott, it was revealed that appellant had voluntarily submitted to two psychiatric interviews.

The first examination was described as neuropsychiatric in character while the second involved the intravenous injection of a barbiturate, sodium Pentothal. This drug is commonly misnomered the "truth serum."

In his brief, appellant states the expert opinion was offered to show: "(a) that the defendant was not a sexual deviate, (b) that defendant did not have the capacity to commit sodomy and (c) that defendant was credible." The record does not sustain the accuracy of this description of the purpose of the offer.

In the course of his endeavors to win admission for the proffered testimony, defense counsel stated:

"That isn't the gravamen of the charge in this case, your Honor. Under the Statute, the charge being sodomy, the question involved is not a matter of defense but a question of whether or not there is an inherent trait of perversion or whether or not, from the doctor's examination, he determined that the defendant is a sexual pervert. That is the type of charge and the gravamen of the indictment.

\* \* \* \* \* \* \* \*

Q. Doctor, are you qualified to pass upon the question, if you know, of whether a person has sexual deviations or sexual deviation traits?

\* \* \* \* \* \* \* \*

Q. And as a result of your examination, first and second, did you come to a conclusion with regard to John Sinnott, and particularly whether or not he has any sexual depravity or any abnormal findings with regard to this man sexually?"

It is our clear impression that there was no intent to support the credibility of Sinnott by this offer, nor was there any indication that the doctor would testify appellant was incapable of committing the crime charged. Certainly, no evidence of physical or organic incapacity was adduced and, as will appear later on, the absence of any discernible deviational traits does not import absolute want of capability to commit a particular sex offense.

We think it is clear that the doctor's testimony was intended to be more or less equivalent to evidence of good character which, under the orthodox rule, generally may be demonstrated only by proof of a good reputation for morality in the community where the defendant is known and not by evidence of particular acts or conduct or by testimony from the personal knowledge of intimates. 7 *Wigmore, Evidence* (3d ed. 1940), §§ 1980, 1983. The doctor's testimony was designed to bear on the probabilities of appellant's having committed the crime in light of a medical finding that his mind was normal and disposition benign, at least in so far as sex offenses are concerned. This is the function of conventional evidence of good character in form of proof of high repute. The desired inferences, however weak, are that a man "of this stripe" would not be predisposed to

commit the particular offense and that, therefore, he in fact did not.

Offers of psychiatric testimony have played a prominent role in trials for sex offenses. There are at least three situations to be distinguished, only one of which necessarily involves questions as to the use and dependability of the so-called "truth sera."

The issue as to the potency of "truth serum" in relaxing the normal powers of mental censorship so that the truth will flow from the subject unimpeded by protective psychic entrenchments becomes important when the defendant has voluntarily submitted to such examination and his answers while under the influence of the drug are offered upon trial to demonstrate his innocence. Here. the answers are compatible with innocence and are offered for the truth of the matters asserted. This constitutes a direct attempt to clear the defendant of wrongdoing upon the strength of out-of-court statements offered for the veracity of their content, and the hearsay rule applies, at least in the absence of some showing of unusual trustworthiness. Research indicates that offers for this purpose have been uniformly rejected and with good cause. *People v. McNichol,* 100 *Cal. App. 2d* 554, 224 *P. 2d* 21 (*Cal. D. Ct. App.* 1950); *State v. Hudson,* 289 *S. W.* 920 (*Mo. Sup. Ct.* 1926); *State v. Lindemuth,* 56 *N. M.* 257, 243 *P. 2d* 325 (*N. M. Sup. Ct.* 1952); *Henderson v. State,* 94 *Okl. Cr.* 45, 230 *P. 2d* 495, 23 *A. L. R. 2d* 1292 (*Okla. Cr. Ct.* 1951); *Orange v. Commonwealth,* 61 *S. E. 2d* 267 (*Va. Sup. Ct. App.* 1950). See *People v. Cullen,* 37 *Cal. 2d* 614, 234 *P. 2d* 1 (*Cal. Sup. Ct.* 1951). Cf. *Lindsey v. U. S.,* 237 *F. 2d* 893 (9 *Cir.* 1956).

The general consensus appears to be that while the "truth sera" are valuable as a diagnostic aid because they tend to diminish the inhibitions of the subject being interviewed, they do not in any wise provoke a certainty of truth-telling on his part. Two professors of law and two professors of psychiatry at Yale have collaborated on an interesting article which is highly informative in this respect. *Dession, Freed-*

man, Donnelly & Redlich, "Drug-Induced Revelation and Criminal Investigation," 62 Yale L. J. 315 (1953). Some fairly lengthy quotations seem justified.

"In summary, experimental and clinical findings indicate that only individuals who have conscious and unconscious reasons for doing so are inclined to confess and yield to interrogation under drug influence. On the other hand, some are able to withhold information and some, especially character neurotics, are able to lie. Others are so suggestible they will describe, in response to suggestive questioning, behavior which never in fact occurred. Notwithstanding these limitations, a drug-induced interview may be a valuable adjunct to an otherwise thorough psychiatric examination. In some instances it may enable a psychiatrist to ascertain more quickly the depth and type of mental illness. But drugs are not 'truth sera.' They lessen inhibitions to verbalization and stimulate unrepressed expression not only of fact but of fancy and suggestion as well. Thus the material produced is not 'truth' in the sense that it conforms to empirical fact. Finally, it is most important to realize that the conduct of the interrogation and the analysis of its verbal and behavorial content are exceedingly complex. The results can be evaluated properly only by trained and experienced experts who are aware of the manifold individual variations in response which occur." (pp. 319–20)

\*    \*    \*    \*    \*    \*    \*    \*

"Considering the present state of scientific knowledge, as developed in the medical section of this article, a transcript of the interview should definitely not be admissible in evidence." (p. 325)

\*    \*    \*    \*    \*    \*    \*    \*

"Thus the bare results of an interview under the influence of drugs should not, standing alone, be considered a valuable and reliable indicator of the facts. As a sole procedure, narcoanalysis is not sufficiently reliable. And where the drug-induced interview is a primary procedure and an otherwise full examination of the subject's personality structure is lacking, the results should not be considered; narcoanalysis should be used only as an adjunctive or auxiliary technique." (p. 342)

An article by the Assistant Medical Director of the Colorado Psychopathic Hospital, who was formerly a psychiatric consultant to the District Courts of Colorado, supports the conclusions reached by the Yale authors. McDonald, "Truth Serum," 46 J. of Crim. Law, Criminology and Police Science 259 (1955):

"The intravenous injection of a drug by a physician in a hospital may appear more scientific than the drinking of large amounts of

bourbon in a tavern, but the end results displayed in the subject's speech may be no more reliable. * * * The test is by no means reliable, and when used indiscriminately, it may cloud rather than clarify criminal investigation." (*p.* 259)

* * * * * * * *

"The suspect who is able to withstand competent and prolonged interrogation is usually able to withstand interrogation under narcosis. The confident criminal relishes the prospect of examination under drugs. He welcomes the opportunity of making self-serving statements in the pseudo-scientific atmosphere of the truth serum test. The only person likely to gain in these circumstances is the criminal who may strengthen the effectiveness of his denials in the eyes of a credulous jury." (*p.* 261)

It may be that in time the development of greater experience, more efficient drugs, and better techniques for their administration will accomplish a more complete control of the subject, resulting in the admissibility of his statements for the truth of their contents. If such halcyon days arrive, and we anticipate they might, little difficulty will be encountered in molding the rules of evidence to accommodate such scientific achievements when they have been generally accepted in the field as uniform and reliable. See *Frye v. U. S., 54 App. D. C. 46, 293 F. 1013 (D. C. Cir. 1923)*.

Professor McCormick says:

"The further validation by experiment and practice, of the scientific theory of the trustworthiness of drug-induced statements, and the further development of the skill of technicians in administering the method, will presumably be followed by the development of appropriate legal doctrines permitting the uses of such statements in evidence." *Evidence,* 374 (1954).

Psychiatric testimony has received acceptance by the courts, however, where it is offered to impugn the credibility of witnesses in a cause, and this is especially, but not exclusively, see *U. S. v. Hiss,* 88 *F. Supp.* 559 (*D. C. S. D. N. Y.* 1950), so where sex offenses are involved. It is said in a "Comment" in 59 *Yale L. J.* 1324 (1950) that:

"Judicial appreciation of psychiatry has been most pronounced in sex offense cases. Recognizing that false sex charges may stem from the psychic complexes of a female who appears normal to the layman, courts have permitted psychiatrists to expose mental defects, hysteria, and pathological lying in sex prosecutrices."

Citing *Jeffers v. State*, 145 *Ga.* 74, 88 *S. E.* 571 (*Ga. Sup. Ct.* 1916). Accord, *State v. Teager*, 222 *Iowa* 391, 269 *N. W.* 348 (*Iowa Sup. Ct.* 1936). *Mell v. State*, 133 *Ark.* 197, 202 *S. W.* 33, *L. R. A.* 1918D, 480 (*Ark. Sup. Ct.* 1918); *State v. Pryor*, 74 *Wash.* 121, 132 *P.* 874, 46 *L. R. A., N. S.*, 1028 (*Wash. Sup. Ct.* 1913); *Rice v. State*, 195 *Wis.* 181, 217 *N. W.* 697 (*Wis. Sup. Ct.* 1928). *People v. Cowles*, 246 *Mich.* 429, 224 *N. W.* 387 (*Mich. Sup. Ct.* 1929); *State v. Wesler*, 1 *N. J.* 58 (1948); *Miller v. State*, 49 *Okl. Cr.* 133, 295 *P.* 403 (*Okl. Cr. Ct.* 1930). Compare *Lindsey v. U. S., supra.*

This article recognizes that clinical examinations are the best test of a witness' credibility, but advocates that a psychiatrist be permitted to testify on the basis of a court-room diagnosis, the theory being that he is better qualified to assess possible personality disorders on the "spur of the moment" than the lay jury. See *U. S. v. Hiss, supra.* A recent case note in 26 *Ind. L. J.* 98 (1950) advances the interesting proposal that complaining witnesses, at least in sex cases, be subjected to clinical examination by a court-appointed psychiatrist upon a showing that they are likely to be suffering from a mental abnormality which may affect credibility. We note the ingenuity without sanctioning the practicality of this idea.

Finally, we reach the situation presented by the facts *sub judice*. Here, the psychiatric testimony was not offered to impeach or to sustain the credibility of the appellant, nor were his utterances while undergoing narcoanalysis offered for their truth. Rather, the attempt was to show by expert opinion that appellant is not a sexual deviate and has no inherent traits of perversion which would lead him to commit sodomy. Similar to evidence of good moral reputation in the community, this testimony was designed to influence the jury to believe that the probabilities were against a man of this disposition having committed the particular act under trial.

"The basic premise is the one by which we order our daily lives, that people generally act in keeping with their character. * * * So it is generally agreed that the accused in all criminal cases may produce evidence of his good character as substantive evidence of his innocence." *McCormick, supra*, at 333.

Some commentators have railed against the illogicality of restricting the method of proof of good character by the defendant to evidence of reputation. *E. g., Wigmore, supra,* at § 1986.

"This excludes evidence of specific acts or blameless life and rules out opinion-evidence as to the character of the accused for the trait in question based on the witness' knowledge and observation. Reputation-evidence, though muted and colorless, is thought to have the advantage of avoiding distracting side-issues as to particular acts and incidents in the past life of the accused." *McCormick, supra,* at 334–35.

The late Justice Jackson expressed in pungent terms a countervailing philosophy which is wary of change in this area:

"We concur in the general opinion of courts, textwriters and the profession that much of this law is archaic, paradoxical and full of compromises and compensations by which an irrational advantage to one side is offset by a poorly reasoned counter-privilege to the other. But somehow it has proved a workable even if clumsy system when moderated by discretionary controls in the hands of a wise and strong trial court. To pull one misshapen stone out of the grotesque structure is more likely simply to upset its present balance between adverse interests than to establish a rational edifice." *Michelson v. U. S.,* 335 *U. S.* 469, 486, 69 *S. Ct.* 213, 93 *L. Ed.* 168 (1948).

Appellant refers us to *People v. Jones,* 42 *Cal.* 2d 219, 266 *P.* 2d 38 (*Cal. Sup. Ct.* 1954), which decided the very question here presented. There, the defendant was prosecuted for committing lewd acts upon a child under 14 years of age. Jones offered the testimony of a psychiatrist who had examined him on two occasions, once with the aid of an injection of sodium pentothal. The trial court refused to permit the psychiatrist to testify that Jones was, paraphrasing the words of counsel, not a sexual deviate and incapable of forming the necessary lustive intent. The Supreme Court of California reversed, overruling an earlier case in an inferior court, *People v. Sellers,* 103 *Cal. App.* 2d 830, 230 *P.* 2d 398 (*Cal. D. Ct. App.* 1951), and dis-

tinguishing those California cases where the statements of the defendant made while under the influence of a drug were held inadmissible to prove the truth of the matters asserted.

It rested its decision primarily upon a California statute providing for the psychiatric examination of persons convicted of a sex offense involving a child below the age of 14. These proceedings, subsequent to conviction, were authorized in order to determine whether the offender was a "sexual psychopath." The court said:

"From evidence which tends to prove that a person is not a sexual psychopath, an inference reasonably may be drawn that he did not commit the act denounced by section 288. * * * The competency of expert opinion in this field of evidence is established by the statutory procedure for the determination of sexual psychopathy. * * * Accordingly, the evidence here excluded was relevant to the general issue before the jury and should have been admitted." (266 *P.* 2d 42)

We have a similar statute in New Jersey. It provides:

"2A:164–3. * * *
Whenever a person is convicted of the offense of rape, carnal abuse, sodomy, open lewdness, indecent exposure or impairing the morals of a minor, or of an attempt to commit any of the aforementioned offenses, the judge shall order the commitment of such person to the diagnostic center for a period not to exceed 60 days. While confined in the said diagnostic center, such person shall be given a complete physical and mental examination.

2A:164–4. * * *
Upon completion of the physical and mental examination of such person, but in no event later than 60 days after the date of the order of commitment, a written report of the results thereof shall be sent to the court.

2A:164–5. * * *
If it shall appear from said report that it has been determined through clinical findings that the offender's conduct was characterized by
a. A pattern of repetitive, compulsive behavior; and
b. Either violence; or
c. An age disparity from which it shall appear that the victim was under the age of 15 years and the offender is an adult aggressor;

it shall be the duty of the court, upon recommendation of the diagnostic center, to submit the offender to a program of specialized treatment for his mental and physical aberrations."

The *Jones* case has been criticized by *Falknor* and *Steffen*, "*Evidence of Character: From the 'Crucible of the Community' to the 'Couch of the Psychiatrist,'*" 102 *U. of Pa. L. R.* 980 (1954), and praised by *Curran*, "*Expert Psychiatric Evidence of Personality Traits*," 103 *U. of Pa. L. R.* 999 (1955). Both articles contain reservations concerning the dependability of the offer in the *Jones* case, especially on the ground that there were only two consultations with the defendant, but Curran maintains that this objection should go to weight rather than to admissibility. Interestingly enough, Curran quotes a letter from Dr. Solomon, the psychiatrist used by Jones, to the effect that he had great difficulty in dealing with questions as to "incapability." Dr. Solomon writes: "* * * it is my opinion that anyone is capable of anything * * *"

As laymen in the field of psychiatry, we are dubious as to the validity of the offer in this case and question the sufficiency of the foundation laid below. We have already stressed the authorities reporting that the administration of "truth serum" does not necessarily produce the truth. Dession, Freedman, *et al.*, emphasize over and over again that use of drugs is only valuable as an "auxiliary procedure in a thorough diagnostic examination." Apparently, however, they and others regard it as unimportant for present purposes that the drugs do not always conduce representations consonant with empirical fact. For diagnosis of personality traits and tendencies it is immaterial, in their opinion, whether the subject is falsifying, either of his own will or in accordance with suggestion. The drug is utilized not primarily to elicit truth but to enable the psychiatrist to more quickly probe the subject's subconscious mind.

The question remains, however, whether with or without the drug the diagnostic examination in this particular case could be considered "thorough" and dependable. No testimony was elicited on this point, and we are hardly in a

position to take judicial notice of the fact that it is common knowledge and agreed upon among experts that two psychiatric consultations are normally sufficient to determine the non-existence of deviational tendencies. *Cf. State v. Dantonio,* 18 *N. J.* 570 (1955); *Cortese v. Cortese,* 10 *N. J. Super.* 152 (*App. Div.* 1950). Our statute, of course, is not too helpful on this point because the Legislature has not defined what it considers to be a reliable examination, nor is there a discernible effort to change the usual rule of admissibility by providing for a post-conviction examination.

If anything, again referring to the issue of dependability, our statute contemplates a much more exhaustive examination than was here employed, because the convicted sex offender in New Jersey can be submitted to diagnosis in a center for up to 60 days.

Furthermore, we believe it is illogical to infer that the enactment of a statute of this sort means the Legislature deemed evidence of lack of deviational traits to be essentially relevant upon the trial of a sex offense. The Legislature evinced a belief that there was a good possibility that a convicted sex offender might be a habitual pervert, but this is a far cry indeed from saying the statute contemplates that lack of deviational traits probably means an accused did not commit a specific and impulsive act of perversion. Obviously, it was recognized that an act against nature might occur without being part of "a pattern of repetitive, compulsive behavior * * *." *N. J. S.* 2A:164–5(a).

Assuming proof of a proper foundation, however, we directly encounter an inquiry into the advisability of changing the customary rule to the extent of permitting the admission of the psychiatric testimony here offered. *State v. Danser,* 116 *N. J. L.* 487 (*E. & A.* 1936); *State v. Williams,* 16 *N. J. Super.* 372 (*App. Div.* 1951); *State v. Barts,* 132 *N. J. L.* 74 (*Sup. Ct.* 1944), affirmed 132 *N. J. L.* 420 (*E. & A.* 1945).

We are not so unreasonably fettered by tradition as to disregard an innovation when we are more than marginally assured it is a worthwhile contribution to our dedicated

effort in the betterment of the administration of justice. It is only after analytical and thoughtful consideration of all the reasons urged, plus a realization of the advancement of modern science, that we determine to exclude the expert psychiatric opinion testimony as to the lack of inherent tendencies toward perversion.

The full significance of the testimony offered, its arborescence and the reflected conflicts and inferences have been carefully weighed. From its most favorable aspect, such testimony has merely a tenuous probative value because there is still a substantial gap to be bridged between the evidence offered and the unlikelihood of the commission of a particular offense.

It appears to be conceded that the value of the diagnosis depends upon a complex of factors, including the effectiveness of the drug (where such is employed) on the subject and the skill and integrity of the attending psychiatrist. Dession, Cohen, et al., supra. Every one experienced in the law is familiar with the controversy which ensues between medical experts when the issue concerns only physical disabilities, which are more susceptible of intersubjective verification than elusive mental · states.

It is fair to assume that if the existence or non-existence of deviational traits is permitted to become an issue at the trial, the State will not stand idly by without producing psychiatrists favorable to its cause. Resultantly, there will be a conflict between the psychiatric experts, making what in reality should be an insignificant inquiry into a prime and perhaps controlling issue.

In general, we adhere to the thoughts expressed by the Supreme Court of New Mexico in a case involving the problem of whether the introduction of drug-induced statements should be permitted. The court said:

"Until the use of the drug as a means of procuring the truth from people under its influence is accorded general scientific recognition, we are unwilling to enlarge the already immense field where medical experts, apparently equally qualified, express such dia-

metrically opposite views on the same facts and conditions, to the despair of the court reporter and the bewilderment of the fact finder." *State v. Lindemuth, supra*, 243 *P.* 2d, at *page* 336.

Moreover, if we admit testimony as to traits or susceptibilities in sex cases, there would seem to be no logical reason for excluding it from other criminal prosecutions. For instance, in *People v. Villegas*, 29 *Cal. App.* 2d 658, 85 *P.* 2d 480 (*Cal. D. Ct. App.* 1938), the defendant in a prosecution for robbery attempted to show he had committed the crime under the coercive influence of a co-defendant. To this end, he offered the testimony of a psychiatrist to the effect that he, the first defendant, was deficient in will power and in bad physical condition, leaving him without sufficient force to "resist the impulse of this other boy to take him out on these robberies." This offer was rejected.

Then too, there must be considered the propriety of the State's launching the first attack, contrary to the ordinary rules governing the admission of character evidence. *State v. D'Ippolito,* 19 *N. J.* 540 (1955). There is also the question as to how far the State may go in rebuttal with testimony which might prove devastating and detrimental to the defendant's rights.

Curran admits that a negative diagnosis has very limited significance in both medicine and law, and concedes the State's rebuttal will have greater probative value because of its positive quality, *i. e.,* defendant *does* have deviational traits. Falknor cautions that the jury may readily get the erroneous impression from the State's expert that the defendant has in fact deviated and therefore tend to decide the case on this basis.

A problem is also raised concerning the extent of the cross-examination by the prosecutor of the defendant's expert as to the specific statements made during the course of the examination, and the many ramifications to which this inquiry would naturally lead, all of which might be extremely damaging to the defendant and most difficult for the trial court to control.

Our conscientious consideration of all of the equations involved makes us conclude that it is better to abstain from pulling "one misshapen stone out of the grotesque structure," than to demolish the whole edifice and produce chaos.

The judgment is affirmed.

JACOBS and WEINTRAUB, JJ., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and WEINTRAUB—6.

*For reversal*—Justice HEHER—1.