209 N.J. Super. 227 (1986)
507 A.2d 283
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
VALERIE BLOME, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted March 10, 1986.
Decided April 1, 1986.
*228 Before Judges MORTON I. GREENBERG, J.H. COLEMAN and HAVEY.
Thomas S. Smith, Jr., Public Defender, attorney for appellant (Joseph D. O'Neill, Designated Counsel, of counsel and on the brief).
Valerie Blome, appellant, filed a supplemental brief pro se.
*229 W. Cary Edwards, Attorney General of New Jersey, attorney for respondent (Jessica S. Oppenheim, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by COLEMAN, J.H., J.A.D.
The crucial question raised by this appeal is whether the State should have been permitted to argue to the jury that defendant could have buttressed the credibility of her insanity defense by submitting to sodium amytal. Defendant was tried for murder, contrary to N.J.S.A. 2C:11-3, and unlawful possession of a shotgun, contrary to N.J.S.A. 2C:39-4a, 2C:39-5c and 2C:58-3. Defendant entered a plea of not guilty by reason of insanity, N.J.S.A. 2C:4-1, which was rejected by the jury and she was found guilty as charged. The trial judge sentenced her on the murder to the custody of the Commissioner of the Department of Corrections for a term of 30 years with the requirement that she serve 15 years before becoming eligible for parole. Concurrent sentences were imposed on the remaining convictions. Defendant has appealed contending, among other things, that the prosecutor's reference to the jury about "defendant's failure to submit to sodium amytal" constitutes reversible error. We agree and reverse the conviction.
Defendant was indicted for the murder of Chester Davis, the father of defendant's son who was four years old at the time of the murder on June 6, 1981. Some events which preceded and followed the murder are pertinent. On May 21, 1981 defendant left her four year old son in the custody of the decedent for a visitation at Davis' home in Bridgeton. On June 1, 1981 defendant went to Davis' home to pick up her son and remained for the night. The next morning the child was taken to a Head Start School Program he attended and early in the day two of his teachers observed that he had been the victim of physical abuse. The Division of Youth and Family Services was notified and the child was admitted to Newcomb Hospital located in *230 Vineland. Upon examination, bruises were found throughout his body and a cut near the rectum or the anal opening was also found.
The Vineland Police Department was notified of the possible child abuse. Det. Cocchi responded to Newcomb Hospital on June 3, 1981 to investigate the possible child abuse case. It became apparent during the investigation that the child had been physically abused and sodomized. Defendant spoke to Det. Cocchi on June 3, 1981 and informed him that she believed the child's father had abused him and that she wanted to file a complaint to that effect. Det. Cocchi informed defendant that the case would be turned over to the State Police in Bridgeton where the child's father lived. Det. Mick of the State Police located in Bridgeton took over the investigation on June 4, 1981. He received conflicting stories from defendant and Davis. On June 5, 1981 defendant and her mother, Valerie Scavelli, spoke with Det. Mick and asked to sign a complaint against Davis. But this request was denied because Det. Mick had received conflicting stories from Davis and defendant. Defendant became extremely upset and stated that she thought Davis was going to get away with abusing her child.
During the evening of June 5, defendant appeared upset at a family barbecue at her mother's house. Scavelli described defendant as acting strangely weird, pacing, crying and smoking excessively. Defendant went to Davis' trailer home after the barbecue. Between 1:30 a.m. and 1:45 a.m. on June 6 Rick Krevson, a neighbor of Davis who lived two trailers away, heard a loud noise which sounded like a car backfiring. The jury was asked to infer that the loud noise came from a shotgun blast which killed Davis.
Between approximately 2:30 a.m. to 3:00 a.m. on June 6, 1981 defendant went to the home of George Robbins. Defendant asked if she could wash up, get a drink and call her mother. Defendant called her mother and made arrangements for her mother to pick her up at the Landis Tavern and Robbins agreed *231 to drive her there. In the car defendant told Robbins and another companion that she remembered coming through some woods and going across a school yard on her way to Robbins' house. She said that she did not know where her car was. Later she said that she thought she killed someone and when asked how, she replied that she thought she had given the person some pills but was not sure. They looked in vain for her car for 5 to 10 minutes before Robbins drove her to the Landis Tavern.
Scavelli testified that defendant called her at approximately 3:00 a.m. on June 6 and asked in a flat voice without emotion to be picked up at the Landis Tavern. She picked up defendant but defendant did not respond to any questions. She took defendant to the parking lot of the Presidential Diner in Vineland to look at her. Defendant did not know where her car and pocketbook were. After trying for an hour to get defendant to respond, Scavelli took her inside the diner. Defendant had no strength and appeared as if in a trance or drugged. Her eyes were fixed. A man whom she knew greeted her but she did not respond. They stayed for half an hour. Before leaving, Scavelli attempted to reach Det. Mick because previously he had offered assistance. She talked to a policeman at the station and told him she would bring defendant there. She drove to the Vineland police station where she was instructed to take defendant to Newcomb Hospital.
Scavelli drove to Newcomb Hospital where defendant was seen in the emergency room. Robert Glenn Jones, a clinical psychologist on duty at the hospital, testified that he observed defendant and found her unresponsive and in a stupor. He recommended hospitalization at a psychiatric hospital upon finding evidence of mental illness. He testified that she was psychotic. Eventually defendant was admitted to Newcomb Hospital where she remained for 12 days for psychosis.
In the evening on June 6, Chester Davis' parents became concerned about him and contacted his landlord to gain access *232 to Davis' trailer. The landlord, Roger Clark, went with the Davises to their son's trailer. They were unable to unlock the door because a screwdriver had been jammed into the lock. They broke a window to gain entrance. From the window Clark saw Chester Davis lying in a pool of blood. Davis was apparently dead from gunshot wounds to the neck and chest. The police were contacted and State Trooper Perry Ashman arrived at approximately 9:45 p.m. He discovered the body on the floor, an AR-15 rifle laying across the arms of a lounge chair and the television playing. Further investigation disclosed that Davis had been shot through a window.
On June 7, Det. Ashman located defendant's car in a parking lot in Upper Deerfield Township. In the car, the detective could see 12 gauge Winchester shotgun shells on the floor of the front seat passenger side. In the trunk of the car, Det. Ashman discovered defendant's purse containing personal identification. On June 11, Det. Ashman obtained a search warrant to determine if the car was in operable condition. The vehicle was in good operating condition.
It was the theory of the prosecution that defendant, motivated by the belief that decedent had not only physically abused her child but had also subjected him to an act of sodomy, took the decedent's life with a shotgun on June 6, 1981. Although defendant did not testify, she asserted the defense of insanity. She maintained that the alleged disclosure of child abuse, sodomy and other events provided such severe stress factors to her already precarious emotional balance that they precipitated a psychotic episode which prevented her from knowing the nature and quality of her act and from being able to differentiate right from wrong. She also contended that she had amnesia between June 5, 1981 and about June 18, 1981, after which she was no longer in a stuporous condition.
In an attempt to establish the defense of insanity, defendant presented the testimony of Dr. Hareesh Phansalker, an internist, who testified he saw defendant on June 6 at 9:30 a.m. at *233 the hospital. Before examining defendant, he was told by Dr. Trias, the first physician who saw defendant at the hospital, that defendant probably had no memory, that she was suffering some kind of psychotic episode and that she probably needed admission into the hospital for observation. Dr. Phansalker's initial observations of defendant were described as follows:
Valerie was lying on her back and turning from side to side. She was gazing in space and she had kind of a sad expression. And apart from that, there was nothing spoken, or she wasn't responding to any questions or any stimuli given; and another thing was that her eyes were peculiarly glassy, as I recall, where they were lackluster type of eyes and she had no muscle tone and she was one minute on her left side, one minute on her back, but she appeared to look at you, but she was still looking through you, that kind of a stare.... I never heard her talk, in fact, during all of her 12 days of hospital admission, I never heard her utter a sound.
Dr. Phansalker testified that he administered diazepam, known popularly as Valium, and a psychotropic drug called Triavil but these had no effect. He said that he then turned the case over to a psychiatrist who administered other kinds of drugs. He stated that when the right dosage of the right drug was given, defendant "just woke up as if from a deep slumber and was starting to talk...."
On cross-examination Dr. Phansalker was questioned extensively about his method of diagnosis and the notes he had taken regarding defendant. He was also questioned without objection about the use of sodium amytal. He was asked:
Q Let me ask you a question about one of your notes, Doctor. You indicate, I think, that there was a question of whether a sodium amytal test was going to be given?
A Yes.
Q What is it?
A No, this is the stage that Dr. George was intending to do one of these tests to sort of get certain facts from the patient as to her condition, what brought it on, et cetera. And later on, I learned that Dr. George doesn't do it and he's in Philadelphia.
Q Do you know what kind of test it is?
A I have no idea, because that's not my expertise.
Q You have no idea what that is?
A No.
*234 The day after Dr. Phansalker had left the witness stand, defense counsel made a motion to exclude any further references to sodium amytal during the remainder of the trial because it was prejudicial to defendant for the prosecution to refer to truth getting means. In opposition to the motion, the State argued that it would not directly link the failure of defendant to undergo a sodium amytal test with an inference of guilt, but rather with defendant's insanity defense, i.e. the quality of the psychiatrist's diagnosis. The trial judge viewed the sodium amytal test as a diagnostic aid which was relevant to the defense of insanity. In denying the motion, the trial judge stated:
The testimony offered yesterday [by Dr. Phansalker] would indicate that the doctor, who treated Mrs. Blome, considered, in his professional, medical judgment, that sodium amytal was a possible treatment alternative and insofar as it was being utilized by a treating doctor and was considered by the treating doctor and, then, apparently, was not utilized, it's the reasons for its non-utilization that can be offered in evidence, at least by way of cross-examination if it is pertinent and if there are legitimate reasons why there was a decision by the patient not to accept her medical advice to utilize that procedure, then the patient can take the stand or someone on her behalf, who has competent evidence to offer, to take the stand and to testify as to why that decision was made.
Had the use of sodium amytal been suggested by law enforcement officials in an investigation of the case, clearly, I would exclude it for the reasons espoused by Mr. O'Neill today, but in view of the fact that it was a recommendation of the treating psychiatrist and there was a refusal to accept the advice of the treating psychiatrist, it's evidential.
Dr. N.J. George, a psychiatrist who took over treatment of defendant from Dr. Phansalker, testified on behalf of defendant. He testified that when defendant was admitted to the hospital, she was in a catatonic state  defendant was not responding to any verbal commands or questioning. He testified that defendant had a history of emotional problems since 1967 when she was nine years old and that she commenced treatment that year at a mental health facility now known as the Cumberland County Guidance Center. While in the hospital, he changed defendant's medication on June 15, 1981 from *235 Triavil to Navane, which was a major antipsychotic drug. After one day the dosage was increased.
One June 18, 1981 defendant became totally alert, coming out of her psychosis. Defendant allegedly suffered a memory lapse and told Dr. George that the last incident she remembers was going to the Bridgeton State Police to make a complaint against Davis and returning home. After that she said she remembers nothing until she came out of her psychosis just prior to her discharge from the hospital. Defendant was then discharged from the hospital with medication and she continued some form of treatment at the Cumberland County Guidance Center.
Dr. George testified that defendant's amnesia was related to her psychosis. He said her type of amnesia generally happens analytically when anything very painful to a person is repressed to the unconsciousness or biologically where a person lives through events but does not recognize or record events in the mind. Dr. George further testified that defendant had a borderline personality disorder. It was his opinion that because of her history of psychosis, defendant did not know the difference between right and wrong if she had killed the man who physically and sexually abused her son. He explained that psychosis is a misevaluation of perception so that although a person may perceive an act as being right, it may actually not be right. He opined that defendant had been in a psychotic state between the time she was refused a complaint against Davis and the time she came out of a stuporous state at the hospital.
Dr. George was cross-examined extensively regarding (1) how psychiatric diagnoses are made, (2) the functioning of psychotic persons, and (3) defendant's alleged amnesia. As the following colloquy demonstrates, Dr. George was cross-examined concerning the use of sodium amytal on defendant to verify the credibility of the stress factor which forms the underpinning for her insanity defense:

*236 Q Now, was there not some discussion of using a test known as the sodium amytal test?
A Yes, it was discussed, yes.
Q And what is the sodium amytal test?
A Well, I'm not well versed in it because I'm not trained in using it, but what I understand is that it is a drug which is given, which is, in ordinary times, called truth serum, but it is not a truth serum. It is a barbituate.
It's a short acting barbituate, which would keep the person sedated to the point and questions are asked, and they might give answers. I have observed only one time it being done during my residency period and I wasn't impressed with the results.
Q But in other words, someone who claims to have amnesia, when administered this drug 
A Yes.
Q  could give an account of what occurred during the claimed period of amnesia, correct?
A Could, but we don't know whether it's accurate or not.
Q But could?
A Yes.
Q Now, was that test discussed and if it was discussed, was it given; and if it wasn't given, can you tell us why?
A. It was not discussed. I recommended that maybe we try it but it cannot be done here, locally, it cannot be done because it has to be done with people who are experienced with it, specialized in that technique.
Q And  well, was there a decision made that it would or would not be?
A Well, at that time, if I remember correctly, the insurance company, the insurance would not pay for the test. This is what I was given to understand at a later date, but not at that time.
Q Okay. But the decision not to take it was one of the patient or the patient's family, or what?
A Well, I only talked with Dr. Phansalker. I never talked about this with the family at all.
Finally, the prosecutor questioned Dr. George regarding a notation made by the nursing staff on defendant's general treatment consent form which was signed by defendant after her discharge from the hospital. The form was a consent for treatment at the Cumberland County Guidance Center which stated, "No IV's being put to sleep to be talked to." The following colloquy took place:
Q Would sodium amytal be an IV?
A Yes, sodium amytal is given IV.
Q And is it, in a sense, being put to sleep to be talked to?

*237 A In a way, yes.
In his summation, the prosecutor argued to the jury:
And what about this amnesia? How do we know  how do we know it's real?
If someone says, I don't remember, there is no objective test of proving that they do, except for one, perhaps.
* * * * * * * *
And we've heard about Valerie, herself, being so concerned about her inability to remember, but when given a chance to take a test that may just solve that question, it's refused. The sodium amytal test, and not only is it refused, when it's discussed with Phansalker and the family, but then the day she signs into the guidance center, which is a couple of weeks later, a release, no I.V.'s or being put to sleep to be talked to.
Why? Afraid of what she's going to say when she can't control it any longer?
One of the main avenues of attack upon the defense of insanity was defendant's failure or refusal to submit to sodium amytal drug which is popularly known as "truth serum." People v. Ford, 304 N.Y. 679, 107 N.E.2d 595 (Ct.App. 1952). As noted previously, defense presented evidence that one of the stress factors which produced defendant's psychotic state was her belief that Davis abused and sodomized her son and that law enforcement officials would not prosecute him. The prosecutor argued to the jury that the insanity defense should not be believed because defendant refused to submit to sodium amytal which would have revealed the truth as to whether Davis or defendant assaulted the child and whether defendant had amnesia. The prosecutor's argument, when boiled down, was: do not believe defendant's insanity defense because she hid the truth which the sodium amytal would have disclosed. It is clear to us from our careful study of the record that the prosecutor undertook to impress upon the jury that defendant had declined to submit to sodium amytal testing which he intimated is a reliable way of determining the credibility of the defense of insanity.
*238 The results of scientific tests are admissible in a criminal trial only when they are shown to have "sufficient scientific basis to produce uniform and reasonably reliable results and will contribute materially to the ascertainment of the truth." State v. Cary, 49 N.J. 343, 352 (1967). See also Romano v. Kimmelman, 96 N.J. 66, 80 (1984); State v. Cavallo, 88 N.J. 508, 517 (1982); State v. Hurd, 86 N.J. 525, 536 (1981). Our Supreme Court has held that "truth serum" drugs may be valuable diagnostic aids because they tend to diminish the inhibitions of the subject being interviewed, but "they do not in any wise provoke a certainty of truth-telling on his part." State v. Sinnott, 24 N.J. 408, 421 (1957). Similarly in State v. Levitt, 36 N.J. 266, 275 (1961) it was held that "[u]nder the present state of scientific knowledge, testimony elicited from a person while he is under the influence of a `truth serum' type drug is inadmissible." Dr. George attested to the unreliability of sodium amytal when he said "we don't know whether it's accurate or not."
It is therefore clear that sodium amytal test results are inadmissible as evidence in New Jersey because they have not been established to be scientifically reliable. Hence it was highly improper for the prosecutor to argue to the jury that defendant's defense of insanity and alleged amnesia should not be believed because she refused to take a sodium amytal test. The results of the test would have been inadmissible even if she had taken one. See State v. Levitt, supra. Such comments were improper even under the guise of attacking the credibility of the insanity defense because the comments went directly to the issue of whether defendant was guilty or not guilty by reason of insanity. The prosecutor argued that defendant should be found guilty because she was concealing the truth. Under these circumstances, we are satisfied that the prosecutor's conduct cannot be regarded as harmless because it raises a reasonable doubt as to whether the improper reference to sodium amytal led the jury to a verdict it otherwise might not have reached. State v. Melvin, 65 N.J. 1, 18-19 (1974). A reversal is therefore required.
*239 We have carefully considered the remaining issues raised on this appeal by counsel and in the pro se brief and find they are without merit. R. 2:11-3(e)(2).
The judgment of conviction is reversed. The case is remanded to the Law Division for a new trial. We do not retain jurisdiction.