66 N.J. Super. 374 (1961)
169 A.2d 172
EDMUND P. HAGOPIAN, PLAINTIFF-APPELLANT,
v.
FREDERICK W. FUCHS, JR., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 23, 1961.
Decided March 24, 1961.
*376 Before Judges GOLDMANN, FOLEY and DRENK.
Mr. William J. McGovern argued the cause for appellant (Messrs. Mackerley & Friedman, attorneys; Mr. Peter Friedman and Mr. George H. Harbaugh, of counsel).
Mr. Frederick W. Fuchs, Jr., respondent, argued the cause pro se.
The opinion of the court was delivered by FOLEY, J.A.D.
Plaintiff appeals from a jury verdict of no cause of action in a suit for damages arising out of an alleged assault and battery.
The incident from which this action arose occurred on February 28, 1957 in a gasoline service station in Buttzville, New Jersey. Plaintiff, a dairy farmer, was a member of the Tri-State Master Dairy Farmers Grand Guild. Defendant, also a dairy farmer, was not a member of this *377 guild. The guild members had been on a "strike" for three or four days prior to the date of the occurrence. The strike, which consisted in withholding the milk supply from the creameries in the area in order to obtain a higher price therefor, had been terminated by an injunctive order issued on February 28 prior to the time of the happening.
In the early morning of that day defendant received a telephone call from a creamery in Pine Brook, N.J., was advised that the strike had ended, and invited to deliver milk to the creamery. He then loaded his own supply of milk on a truck, picked up milk from five other farmers in the area, and accompanied by another farmer, started for Pine Brook at about 8:30 A.M. Prior to doing so he notified the State Police of his intended route in order that it might be patrolled, and arranged with Harry Yohe, the other farmer, to drive behind him in his car "just in case something should happen due to the * * * activities during the week." These "activities" included an incident in which defendant had been involved in Hackettstown three days previously when, while attempting to deliver milk, he had been intercepted and attacked by a group of striking guild members.
While proceeding westerly on route 46 from Hackettstown toward Buttzville, defendant's truck was passed by a passenger vehicle which plaintiff was driving in an easterly direction. Defendant, apprehensive of trouble, noticed that after the car had gone by, the driver turned it around and began to follow him. Defendant testified that because of the attack made on him in Hackettstown on February 25, he became fearful of his safety and accelerated the speed of his truck. Plaintiff said that he recognized defendant's vehicle as a milk truck and that he wanted to talk to the driver in the hope of persuading him to join the guild. Neither party knew the other.
While there are some deviations in detail, the facts concerning what happened thereafter were not in substantial dispute. After driving the truck at a high speed for about *378 a mile in an effort to avoid being overtaken, defendant drove into a gasoline service station. Plaintiff's car arrived there at about the same time. The occupants of both vehicles got out. Defendant had in his hand a steel wedge weighing four pounds. Plaintiff approached defendant; he said his purpose was to talk to him. Neither he nor his companions were armed with weapons of any kind. Defendant, as he backed toward the rear of the truck, called for the police and for help, and warned the men not to come any closer. Plaintiff continued to advance. Defendant had noticed that two of plaintiff's companions had gone around on the other side of the truck. In the words of the defendant:
"* * * I saw two go that way; and I didn't see them until they appeared on the right side of the truck, at the tail. I was six feet beyond the tail slightly behind the truck.
With that, Hagopian, not heeding any warning at all, continued and made a turn, and made a reach. And I struck because of the fact of the other two coming around; and the fear, I was going to get touched and I knowed they were going to do property damage."
Defendant further testified that he thought plaintiff had turned to reach for a rope to pull himself up on defendant's truck.
"* * * I swung and threw the wedge. That wedge struck him on the head as he started to rise up. And why or how, I don't know to this day yet, but I can see that wedge strike. The wedge glanced off and it came right back into my hand. I caught it, and I charged the fellows on the right side and they dispersed."
Cross-examination of defendant revealed that plaintiff was about four to six feet away when defendant threw the wedge at him; that at the moment the wedge was thrown, plaintiff's back was turned to defendant, and that defendant actually aimed the wedge at plaintiff's head.
Defendant pleaded self-defense.
Plaintiff did not claim that the evidence proffered by defendant at the trial was insufficient as a matter of law *379 to sustain the defense; on the contrary, he treated the issue as one of fact and submitted to the trial judge requests to charge on this subject. On his motion for new trial as to this aspect of the case, it was argued only that the verdict was contrary to the weight of the evidence.
One of the points advanced by plaintiff on this appeal is that the trial court erred in refusing to charge plaintiff's written request that:
"In this case, defendant has pleaded self-defense to justify his admitted assault and battery upon the plaintiff. This is what is known in law as an affirmative defense, and before you may seriously consider it, you must first find that defendant has proved by a preponderance of the credible evidence that the conduct of plaintiff was such as to cause a reasonably prudent person in defendant's position to be put in fear of his own safety. Unless the evidence so indicates, the defense of self-protection is not sustained and you must disregard it."
It is beyond dispute that the self-defense plea is an affirmative one and, therefore, that the burden of proof is carried by him who asserts it. See Prosser, Law of Torts (2d ed. 1955), § 19, at p. 88. See also Schisano v. Brickseal Refractory Co., 62 N.J. Super. 269, 274 (App. Div. 1960), affirmed o.b., 33 N.J. 323 (1960). The trial court, in disposing of this request to charge, was evidently under the impression that he had given instructions to the jury on the subject in the body of his charge, and so stated. However, in noting his objection counsel stated that the court's impression in this regard was erroneous. The court made no further comment except to note counsel's objection.
We have examined the charge carefully and find the objection to be well founded. The court properly charged that the burden was on the plaintiff to establish "his charges and damages by a preponderance of the credible evidence." The court went on to say that if the jury found the testimony to be "evenly balanced, then the party, upon whom the burden rests to prove the same by a preponderance of the credible evidence, must be deemed to have failed in *380 that regard." This was followed by a brief and accurate statement of the central issue in the case namely:
"* * * the plaintiff says, that he was the victim of an unprovoked assault and battery by the defendant. The defendant says, that his act in striking the plaintiff was justified, in order to protect himself from bodily harm."
The judge then discussed at considerable length the elements of self-defense and the circumstances under which it could be invoked. He did not, however, adequately distinguish between the degree of force permitted one who is in reasonable apprehension that he is in peril of death or serious bodily harm, and the force which he is privileged to use in circumstances where the means used by his assailant are not intended or likely to cause death or serious bodily harm. We will discuss this distinction hereinafter, but whatever the degree of force the jury may have found that defendant was entitled to employ in the circumstances, it is plain that the jury was not told that the burden of proving the facts giving rise to the privilege was at all times upon the defendant.
The very nature of the case, as revealed by the uncontradicted facts, underscores the dangers implicit in the failure to charge defendant's burden. As the matter was presented to the jury, it was required to determine only whether the evidence offered by the defendant so weakened the effect of plaintiff's proof of an unlawful assault as to permit the jury to conclude that plaintiff had failed to sustain his burden of proof. However, the fact is that plaintiff proved, and defendant admitted, an assault with a deadly weapon. Consequently, the only question for the jury to determine was whether the defendant was privileged to commit the same. Obviously, the failure to advise the jury that defendant was burdened with proving this to be a fact, by a preponderance of the evidence, relieved him of an onerous task, properly cast upon him by the law in the interest of human life and safety. This was prejudicial error requiring reversal.
*381 Since the case must be retried a consideration by the trial judge of applicable principles will be in order. At the outset, it can scarcely be denied that the steel wedge which defendant intentionally aimed at plaintiff's head while his back was turned was a deadly weapon. The use of a means of self-defense intended or likely to cause death or serious bodily harm is not privileged for the purpose of preventing the infliction of a lesser harm upon the actor. If the actor adopts such a means to protect himself against the lesser bodily harm, he is liable, although the harm which he actually inflicts is one which he would have been privileged to inflict by a less dangerous means. Restatement, Torts, § 63, p. 123 (1934).
The phrase "serious bodily harm" is used to describe a bodily harm, the consequence of which is so grave or serious that it is regarded as differing in kind, and not merely in degree, from other bodily harm. A harm which creates a substantial risk of fatal consequences is a "serious bodily harm" as is a harm, the infliction of which constitutes the crime of mayhem. The permanent or protracted loss of the function of any important member or organ is also a "serious bodily harm." Restatement, Torts, § 63, comment (b), p. 121 (1934).
The intentional infliction upon another of a harmful contact by means intended or likely to cause death or serious bodily harm is privileged only if the actor reasonably believes that he is thereby put in peril of death or serious bodily harm which can be safely prevented only by the immediate use of such self-defensive means. Restatement, Torts, § 65, p. 135 (1934). Even then the intentional use of a deadly weapon is not privileged if the actor reasonably believes that he can with complete safety avoid the necessity of so defending himself by retreat, in any place other than his dwelling place. Ibid., at p. 135.
In evaluating the conduct of this defendant in light of these principles the primary inquiry should be: were the circumstances which were known to him, or should have *382 been known to him, such as would lead a reasonable man, one of ordinary firmness and courage, to entertain an apprehension that he was in danger of death or serious bodily harm? See Restatement, Torts, § 63, comment (i), p. 126 (1934); § 65, comment (e), p. 137. See also Prosser, Law of Torts (2d ed. 1955), § 19, pp. 88-89.
We are not unmindful that although the threat which creates the privilege must be that of an immediate invasion of the actor's interests, previous threats or attacks may be important in connection with other circumstances to produce a situation which does create the privilege, although that alone would not justify the invasion. 1 Harper & James, The Law of Torts, § 311, p. 241 (1956). Hence, the prior attack on defendant and the circumstances surrounding the milk strike would be relevant to the reasonableness of defendant's belief that he was in peril of death or serious bodily harm. Yet, this factor should be considered in the context of the circumstances existing at the time he threw the lethal wedge at plaintiff's head. As noted, the uncontroverted evidence is that at that moment plaintiff had turned his back to defendant. He was unarmed and had made no threats nor manifested malice. It is at least doubtful that defendant as a reasonable man had the right to conclude that he was in peril of death or serious bodily harm, and it may be that if the trial court had been requested to do so he would have declared, as a matter of law, that in throwing the wedge, plaintiff exceeded the privilege which is granted to him. However, as we observed, this issue was litigated as a factual matter rather than one of law and we do not suggest that the trial court was under any obligation to take it from the jury, absent a motion to that effect by plaintiff. Nevertheless, we think it should be considered by the trial court on the retrial in the light of the evidence adduced therein, and if on such evidence the court concludes that a factual issue appears, care should be taken to inform the jury of the precise boundaries of defendant's privilege.
Again with a view toward retrial, there are other points *383 raised by the appeal which merit discussion. Defendant produced a Sergeant Gillen of the State Police who testified as to a report prepared by him. This report was prepared as a result of an investigation of the "Hackettstown incident." In large measure it consisted of statements which defendant had made to Sergeant Gillen some hours after the incident had occurred. Plaintiff objected to this testimony on the grounds that it was too remote to be relevant and that it was hearsay, consisting merely of defendant's self-serving declarations.
Initially, we will consider the hearsay aspects of the testimony. The trial court admited it under the misty veil of res gestae. Primarily, the term res gestae is used to describe four separate exceptions to the hearsay rule, each of which is grounded on different indicia of special trustworthiness. These are: (1) declarations of present bodily condition, (2) declarations of present mental states and emotions, (3) excited utterances, and (4) declarations of present sense impressions. McCormick on Evidence, § 274, at p. 586 (1954). In addition, the phrase is often applied to non-hearsay declarations such as verbal acts, e.g., an oral promise which is part of an alleged contract. Ibid.
Our analysis leads us to the conclusion that the only possible exception which might encompass defendant's out-of-court declarations to Sergeant Gillen is that dealing with excited utterances. This exception requires that the statement be uttered under stress of excitement produced by a startling event and made before the declarant has had time or opportunity to reflect or contrive. Id., § 272, at p. 578. Manifestly, defendant's narration of past events to the police officer several hours after the incident does not meet the criteria of an excited utterance. It was error to admit this testimony, but in the instant case, we find the error was non-prejudicial since defendant and another witness testified directly to the same events which Sergeant Gillen related.
*384 It remains to be considered whether any testimony relating to the Hackettstown incident, hearsay or not, should not have been admitted. It is urged that the admission of testimony concerning threats and violence to defendant by a mob at Hackettstown was erroneous because it was too remote. This challenge is to the relevancy of such evidence. The attack is two-pronged: (1) the threats and violence occurred three days prior to the assault and battery in issue, and (2) the plaintiff and his companions were not shown to have been involved in this incident. Only the first of the propositions can properly be referred to as being remote.
The central inquiry in determining relevancy is whether the evidence offered renders the desired inference more probable than it would be without the evidence. McCormick, supra, § 152, at p. 318. For what purpose was this evidence offered? It was offered to show that when defendant struck plaintiff with the wedge, one of the circumstances which affected his belief that he was in danger of bodily harm was that he had been attacked by a mob three days previously. The Hackettstown incident was a result of defendant's refusing to join the striking dairy farmers. At the time defendant assaulted plaintiff, he still had reason to fear bodily harm from the striking dairy farmers. Certainly, this incident which occurred only three days previously was not so remote in time as not to have a bearing on defendant's apprehension of bodily harm at the time he assaulted plaintiff. No doubt the Hackettstown incident was still fresh in his mind. In fact, he had requested police protection the very same day he assaulted plaintiff. Furthermore, the fact that plaintiff and his companions were not part of the Hackettstown mob does not make the evidence irrelevant. The situation must be viewed in the context of the milk strike. Any evidence which would indicate that it was more probable defendant acted under a reasonable belief that he was threatened with bodily harm than if such evidence were excluded, would be relevant. Surely, evidence that defendant had been attacked by a *385 mob of striking dairy farmers three days previously would permit a finding of probability that he acted under a reasonable belief that he was in danger of some bodily harm when approached by plaintiff, who had turned around and followed his truck into a gasoline station, and to that extent it was admissible.
It is doubtful that any other allegations of error made by plaintiff will recur should this case be retried. Nonetheless, perhaps a brief comment would be appropriate.
As to Sergeant Gillen's being an undisclosed witness, as noted before, since his testimony was repeated by defendant and another witness, permitting him to testify was not sufficiently prejudicial to achieve the magnitude of reversible error.
Since the jury never reached the issue of damages, failure to instruct them as to aggravation and punitive damages could not have been prejudicial. We assume if the case is retried, plaintiff will plead these matters.
Reversed and remanded for a new trial.