STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
MICHAEL CAVALLO AND DAVID R. MURRO,
DEFENDANTS-APPELLANTS.

Argued November 17, 1981—Decided February 17, 1982.

510

*Steven H. Gifis* argued the cause for appellants.

*Lorane L. Posner*, Deputy Attorney General, argued the cause for respondent (*James R. Zazzali*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

PASHMAN, J.

Defendants Michael Cavallo and David Murro were indicted by the Hunterdon County grand jury for abduction, *N.J.S.A.* 2A:86–1, sodomy, *N.J.S.A.* 2A:143–1, private lewdness, *N.J.S.A.* 2A:115–1, and rape, *N.J.S.A.* 2A:138–1. The indictments arose out of an incident on June 16, 1977 involving defendants and S. T., the alleged victim, a married woman who was two months pregnant. S. T. states that she was abducted from a Hunterdon bar and raped by defendants who in turn assert that she

willingly accompanied them from the bar to engage in consensual sexual activity. Since there were no witnesses, the trial necessarily focused on the credibility of the conflicting descriptions of those events.

At trial, defendant Cavallo sought to offer the expert testimony of Dr. Kuris, a psychiatrist from the Hunterdon Medical Center. This witness was offered as an expert character witness who would testify that Cavallo does not have the psychological traits of a rapist. The offer of proof, as it appears in the transcript, is as follows:

> MR. SKOWRONEK: Your Honor, he is going to testify as to Mr. Cavallo's character which is that he knows right from wrong, that he is a well-meaning individual, he would not wilfully do a wrong, he recognizes the force and violence of rape are wrongful acts, he is a non-violent, non-aggressive person and he will also testify to the fact that the physical or the characteristics exhibited by rapists in his experience as a psychiatrist are these people are aggressive, violent people and that Mr. Cavallo does not fit within this mold.

The trial judge refused to allow the expert testimony. The sole issue on this appeal is the correctness of that ruling under Evidence Rules 47 and 56. We hold that the trial judge properly excluded the expert character testimony.

## I

The parties agree that some time after midnight on June 16, S. T. went to the Pittstown Inn, a bar near her home. While there, she met and conversed with defendant Murro who invited S. T. to smoke some marijuana with him and his cousin Cavallo in Cavallo's car. S. T. accepted and the three left the bar for the parking lot. Thereafter, the parties differ sharply as to what happened that night.

According to S. T., instead of smoking marijuana in the car with her as she had expected, defendants stated that the marijuana was located at Cavallo's house approximately two miles away. S. T. agreed to go with them to Cavallo's house. Instead, defendants drove her to an empty field where they raped her, forcing her to engage in various sexual acts with them without her consent. Finally, they returned her to the parking lot at the Pittstown Inn.

According to defendants, they and S. T. drove around for approximately 15 minutes smoking marijuana. As Cavallo was driving, S. T. and Murro began to embrace. They then drove to an empty field, where S. T. and Murro engaged in sex in the back of the car. S. T. then invited Cavallo to join them, whereupon the three of them engaged in consensual sexual activity with S. T. as a willing partner. Defendants then drove S. T. back to the Pittstown Inn.

After returning to the bar, S. T. immediately drove home. She and her husband then went to police headquarters at 2:45 that morning to report the alleged rape. From there, S. T. was taken to Hunterdon Medical Center.

Defendants were indicted and pleaded not guilty to all charges. After a jury trial, they were convicted of rape, abduction and private lewdness, and acquitted of sodomy. Murro's motion for a new trial was denied. He was sentenced to three to seven years for abduction, two to three for lewdness and twelve to twenty for rape, all consecutive, for an aggregate of seventeen to thirty years. Cavallo was sentenced to consecutive terms of three to five years for abduction, one to two for lewdness and ten to twenty for rape, for an aggregate of fourteen to twenty-seven years.

Defendants filed a joint appeal from their convictions and sentences challenging the exclusion of Dr. Kuris' testimony and raising various other claims. The Appellate Division, in an unpublished *per curiam* opinion, affirmed the convictions. However, it held the sentences to be manifestly excessive and remanded to the Law Division for resentencing. On remand, each defendant was sentenced to ten to fifteen years on the rape charge and to lesser concurrent sentences on the other two counts.

The Appellate Division held the proffered expert testimony inadmissible under Rule 47, which governs admissibility of character evidence. While Rule 47 permits some types of expert character evidence, the Appellate Division stated that "the rule

could not contemplate testimony of the kind proffered in this case." The court noted that admission of this testimony could divert the attention of the jury from factual guilt or innocence to the defendants' propensities.[1]

We granted defendants' petition for certification, 87 *N.J.* 370 (1981), on the issue of the admissibility of Dr. Kuris' testimony, and now affirm.

## II

Dr. Kuris' testimony is offered as expert opinion evidence of Cavallo's character under Rule 47, which provides:

> Subject to Rules 48 and 55, a trait of character offered for the purpose of drawing inferences as to the conduct of a person on a specified occasion may be proved only by: (a) testimony in the form of opinion, (b) evidence of reputation, or (c) evidence of conviction of a crime which tends to prove the trait. Specific instances of conduct not the subject of a conviction of a crime shall be inadmissible. In a criminal proceeding, evidence offered by the prosecution of a trait of character of the defendant on trial may be admitted only if the judge has admitted evidence of good character offered by the defendant. Character evidence offered by the defendant may not be excluded under Rule 4. The credibility of a character witness testifying on behalf of the defendant may not be impaired by an inquiry into his knowledge of the defendant's alleged criminal conduct not evidenced by a conviction.

This rule, adopted in 1967, amended the prior New Jersey practice by allowing a trait of character to be proved by opinion as well as reputation evidence. This amendment permits both lay and expert opinions. The rule does not exclude expert opinions and the comment explicitly includes them. However, while allowing expert character evidence, Rule 47 clearly contemplates that such testimony must qualify as proper expert evidence:

> This type of evidence is now admissible provided that a proper foundation is laid for the expert's testimony. If the court feels that a witness does not have sufficient expertise to give expert testimony as to character or that the opinion

---

[1] In addition, the court hypothesized that psychiatric testimony as to the character of the *victim* might be rendered admissible if the evidence here were admitted. Evidence of the victim's sexual history is admissible only in highly limited circumstances. *R.* 40A–1.

offered does not satisfy the requirements of Rule 56(2), the opinion evidence may be excluded. [State Rules of Court Review Commission, *New Jersey Rules of Evidence*, Rule 47, comment 4]

*See Report of the Supreme Court Committee on Evidence* (1963) at 92–93 (discussing the issue of expert character testimony and concluding, on balance, that such testimony should be admitted if a proper foundation is provided). We therefore hold that after a proper foundation has been laid, expert opinion character testimony is admissible under Rule 47, subject to Rule 56(2).

The State argues that the proffered evidence is irrelevant, since regardless of whether Cavallo has the characteristics of a "rapist," he may indeed have committed rape on this particular occasion. However, this is not the standard for relevance under our rules. The State's argument would render virtually all character testimony, lay or expert, irrelevant and inadmissible. That argument addresses the weight to be accorded the testimony rather than its relevance.

Rule 1(2) defines relevant evidence as "evidence having any tendency in reason to prove any material fact." New Jersey case law both before and after the promulgation of the rule defines the test to be whether the evidence "renders the desired inference more probable than it would be without the evidence." *State v. Deatore*, 70 *N.J.* 100, 116 (1976) (Hughes, C. J., writing for himself and Mountain, J.); *Hagopian v. Fuchs*, 66 *N.J.Super.* 374, 384 (App.Div.1961). *See McCormick on Evidence* § 185 (2d ed. 1972). The inquiry is whether knowledge that Cavallo does not possess the traits commonly found in "rapists" increases the likelihood that Cavallo did not commit a rape on the occasion in question. For purposes of determining relevance, we treat the proffered testimony as reliable. Obviously, inaccurate testimony, lay or expert, has no tendency to prove any material fact.

Viewed from that standpoint, the testimony is clearly relevant for the same reason that all character testimony is

relevant: favorable evidence of the defendant's character has some tendency to create doubts as to whether the defendant committed the offense charged. Rule 47 assumes the relevance of character evidence "offered for the purpose of drawing inferences as to the conduct of a person on a specified occasion." As McCormick explains:

> The basic premise is the one by which we order our daily lives, that people generally act in keeping with their character. [*McCormick, supra,* § 191]

*See State v. Costa,* 139 *N.J.Super.* 588 (Law Div. 1976); 1 Wigmore, *Evidence* § 56 (3rd ed. 1940). That is precisely the inference for which Dr. Kuris' testimony is proffered: the fact that Cavallo has the character of a non-rapist is used to draw an inference that he did not commit rape on this occasion. Assuming the reliability of Dr. Kuris' conclusions, his testimony makes it more likely than otherwise that Cavallo did not rape S. T. Consequently, the proffered evidence is relevant.

### III

Having concluded that the testimony offered is relevant and that expert character testimony is generally permitted under Rule 47, we now determine whether Dr. Kuris' expert testimony satisfies the special limitations placed on expert evidence by Rule 56(2) and by New Jersey case law. Rule 56(2) provides:

> If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (a) based primarily on facts, data or other expert opinion established by evidence at the trial and (b) within the scope of the special knowledge, skill, experience or training possessed by the witness.

Under Rule 56(2)(b), expert testimony is admissible only if the expert has sufficient expertise to offer the intended testimony and the testimony itself is sufficiently reliable. No question has been raised as to the general qualification of Dr. Kuris as a psychiatrist. The relevant inquiry therefore is whether the

testimony satisfies New Jersey's "standard of acceptability for scientific evidence." *State v. Hurd*, 86 *N.J.* 525, 536 (1981).[2]

■ Scientific evidence is admissible if the proposed technique or mode of analysis has "sufficient scientific basis to produce uniform and *reasonably reliable* results and will contribute materially to the ascertainment of the truth." *State v. Cary*, 49 *N.J.* 343, 352 (1967), quoted in *Hurd*, 86 *N.J.* at 536 (emphasis added). *See Frye v. United States*, 293 *F.* 1013 (D.C.Cir.1923) (generally viewed as the seminal case on scientific evidence). Applying this test to the testimony offered here, the issue becomes whether there exists a "special knowledge, skill, experience or training" by which any expert can determine, with reasonable reliability, whether an individual has a mental make-up rendering him unlikely to have committed rape on a specific occasion.[3]

Traditionally, the test was applied to the results of "physical" scientific techniques, such as radar and the polygraph. *See, e.g., Cary*, 49 *N.J.* at 352 (voiceprints); *State v. Walker*, 37 *N.J.* 208, 214–17, *cert.* den., 371 *U.S.* 850, 83 *S.Ct.* 89, 9 *L.Ed.2d* 86 (1962) (polygraph); *State v. Dantonio*, 18 *N.J.* 570 (1955) (radar). However, in *Hurd* we applied the same test to the admissibility of hypnotically refreshed testimony, holding such testimony inadmissible in the absence of specified procedures designed to assure its reliability.

---

[2]The requirement that evidence based on scientific techniques not generally accepted be subject to special prerequisites to admissibility is logically an element of Rule 56(2)(b), since testimony cannot be within an expert's "special knowledge" if such knowledge has not been accepted as reliable by the courts. Historically, this requirement derives from our common law of evidence and has survived the adoption of the Rules. *See, Hurd,* 86 *N.J.* at 536, and the cases cited therein. We now treat it as an element of Rule 56, to be applied to any evidence to which the other Rule 56 strictures are applied.

[3]The application of this test is discussed *infra* at 520ff.

The policies for applying the test to physical techniques such as radar apply as well to psychiatric testimony. The general standard for admissibility of expert testimony is whether it will be "an aid to the court or jury in determining the question in issue." State Rules of Court Review Commission, *supra*, Rule 56, Comment 5. *See Nesta v. Meyer*, 100 *N.J.Super.* 434 (App.Div.1968). An expert opinion is obviously not helpful if it is based upon unreliable premises.

In this case the psychiatrist sought to testify that Cavallo did not have the characteristics common to all or most rapists. Two assumptions underlie this testimony: (1) there exist particular mental characteristics peculiar to rapists, and (2) psychiatrists, by examining an individual, can determine whether or not he possesses those characteristics. The policy that scientific evidence be reasonably accurate requires us to apply the standards for admission of scientific evidence to Dr. Kuris' testimony. Defendants must therefore demonstrate that these two assumptions satisfy the Rule 56 standard of reliability.

Defendants argue that considerations of reliability should determine the weight accorded to scientific testimony, not its admissibility. Such evidence should be placed before the jury, which can evaluate the evidence as it deems proper, as it traditionally evaluates all evidence before it. *See* Rule 7(f); *State v. Moore*, 147 *N.J.Super.* 47, 51 (App.Div.1977). However, this Court has previously pointed to substantial countervailing considerations that mandate that there be some assurance of reliability before scientific evidence is admitted.

In *Hurd*, we alluded to the problems of "prejudice, jury confusion, and consumption of time and trial resources." 86 *N.J.* at 536. *See Commonwealth v. Vitello*, 376 *Mass.* 426, 381 *N.E.2d* 582, 592–94 (1978) (polygraph evidence held inadmissible). The danger of prejudice through introduction of unreliable expert evidence is clear. While juries would not always accord excessive weight to unreliable expert testimony, there is substantial danger that they would do so, precisely because the evidence is labeled "scientific" and "expert."

Further, if defendants are permitted to introduce psychiatric testimony on their character, "the State will not stand idly by without producing psychiatrists favorable to its cause." *State v. Sinnott,* 24 *N.J.* 408, 429 (1957). The result must necessarily be a "battle of experts" concerning the validity of the expert evidence. This would consume substantial court time and cost both parties much time and expense. Much of the trial would focus on the tangential issue of the reliability of the expert evidence rather than the central issue of what the defendants did or did not do.

The inevitability of a "battle of the experts" in this type of case is clear. In so subjective a field as psychiatry, the experts are bound to differ. Falknor & Steffen, "Evidence of Character: From the 'Crucible of the Community' to the 'Couch of the Psychiatrist,' " 102 *U.Pa.L.Rev.* 980, 994 (1954). The parties will spend untold time and money locating experts and preparing to cross-examine opposing experts. Court time will then be spent presenting the experts. With so much attention paid to the expert testimony, it is likely that the attention of the jury will be similarly diverted. As a result, there is the danger that the trial will turn not on the facts of the case, not on whether the defendant committed the crime of rape, but rather on whether the defendant manifests the characteristics of a "rapist."

In part for these reasons, in *Sinnott, supra,* we upheld the exclusion of psychiatric character evidence offered to show that a defendant charged with sodomy "was not a sexual deviate" and "did not have the capacity to commit sodomy." *Id.* at 419. *See Falknor v. Steffen, supra. Contra People v. Jones,* 42 *Cal.*2d 219, 266 *P.*2d 38 (1954) (allowing admission of psychiatric testimony that defendant charged with child abuse is not a sexual deviate). While *Sinnott* predates the promulgation of the Rules of Evidence, much of its underlying rationale remains valid.

Where expert testimony is sufficiently reliable to be of assistance to the jury, it should be admitted despite the dangers discussed above. It will then be for the opposing party to

discredit the evidence and for the jury ultimately to determine its proper weight. Scientific testimony can be quite useful at trial. However, expert testimony is admissible only if it meets the threshold of reliability required by Rule 56 and by *Hurd* and other relevant cases.

There is no exception to these requirements for evidence offered by criminal defendants. Rule 56 does not include such an exception, and our cases have excluded unreliable expert evidence offered by defendants. *See Sinnott, supra* (psychiatric character evidence), and *Walker, supra* (polygraph).

We therefore conclude that the foundation requirements for the admissibility of new scientific techniques should be applied to Dr. Kuris' testimony. We now examine these requirements in greater detail and apply them to this case.

### IV

Under *Hurd,* scientific evidence is admissible if it possesses a "sufficient scientific basis to produce uniform and reasonably reliable results and will contribute materially to the ascertainment of the truth." 86 *N.J.* at 536, quoting *Cary,* 49 *N.J.* at 352.

What constitutes reasonable reliability depends in part on the context of the proceedings involved. The policy underlying Rule 56 is to exclude expert evidence when the danger it poses of prejudice, confusion and diversion of attention exceeds its helpfulness to the factfinder because the expertise is not sufficiently reliable. In part, the Rule entails a weighing of reliability against prejudice in light of the context in which the evidence is offered. Expert evidence that poses too great a danger of prejudice in some situations, and for some purposes, may be admissible in other circumstances where it will be more helpful and less prejudicial.

The *Hurd* formulation differs somewhat from the traditional standard set forth in *Frye, supra,* where the D. C. Circuit Court held:

Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, *the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.* [*Id.* at 1014 (emphasis supplied)]

The *Frye* test recognizes that most judges are experts in few, if any, fields of scientific endeavor. Judges are not well suited to determine the inherent reliability of expert evidence, but they can decide whether the proffered evidence has gained "general acceptance" in the scientific community. The proponent of expert evidence can therefore meet his burden by demonstrating that the testimony has achieved enough acceptance in the scientific community to convince the court that it is reasonably reliable. We need not at this time conclude that this is the only permissible means of demonstrating reliability.

We turn now to the difficult question of how the proponent of scientific evidence can prove its "general acceptance" and thereby its reliability. "Three methods of proof have been recognized by the courts: (1) expert testimony, (2) scientific and legal writings, and (3) judicial opinions." Giannelli, "The Admissibility of Novel Scientific Evidence: *Frye v. United States*, a Half-Century Later," 80 *Colum.L.Rev.* 1197, 1215 (1980). All three present problems, but all three may be used in appropriate circumstances. *See Hurd, supra; Dantonio, supra.*

In *Hurd* the proponents used the first method of proving general acceptance, submitting expert testimony along with documentary evidence to prove that hypnotically refreshed testimony is generally accepted as reliable. Here, defendants have offered no expert testimony as to the general acceptance, by psychiatrists or any other medical community, of the scientific premises upon which Dr. Kuris based his analysis.[4]

---

[4]At oral argument before this Court, counsel for defendants was asked several times whether he was prepared, at trial, to demonstrate the accept-

Evidence of scientific reliability may also be reflected in authoritative scientific and legal writings.[5] Reference to scientific writings was involved in part in *Hurd,* but is not shown in the present case. Defendants did not cite any articles on which we could rely in taking judicial notice of scientific acceptance.

Defendants therefore must rely on precedent from other courts that have considered the matter and have admitted similar evidence. They urge in addition that similar scientific evidence is generally relied on in the law for other purposes, such as the application of sexual psychopath laws. *N.J.S.A.* 2C:47–1 to –7. Finally, they suggest that legislation such as sexual psychopath laws represents an implicit determination by the Legislature that such testimony is reliable.

The State argues that *State v. Sinnott, supra,* excludes Dr. Kuris' testimony. In *Sinnott,* we held inadmissible an offer of psychiatric testimony that a defendant charged with sodomy "is not a sexual deviate and has no inherent traits of perversion which would lead him to commit sodomy." 24 *N.J.* at 424. However, the *Sinnott* holding ultimately relied on the traditional rule of evidence allowing character to be proved only by reputation. Thus, although much of the reasoning in *Sinnott* remains valid, the holding is superseded by the change in *R.* 47 allowing opinion evidence of character.

There is substantial support for the general acceptance of psychiatric witnesses in court. *See, e.g., State v. Kelly,* 118 *N.J.Super.* 38 (App.Div.1972) (psychiatric testimony regarding defendant's mental illness used in insanity defense). But the issue here is not the reliability of psychiatric testimony relating to an individual's psychiatric condition. Rather, the question is

---

ance of those premises in the scientific community. His answers indicated that he was not so prepared.

[5] This method of proving reliability would entail a form of judicial notice that the scientific community accepts the premises underlying the proffered testimony.

the reliability of psychiatric testimony on the likelihood that an individual behaved in a particular manner on a specific occasion. We must decide here (1) whether psychiatrists agree that rapists share particular mental characteristics and (2) whether psychiatrists can ascertain if an individual possesses those characteristics by examining him.

A review of cases in other jurisdictions does not persuade us that it is generally accepted in the medical or legal communities that psychiatrists possess such knowledge or capabilities. Indeed, the only cases we have found supporting defendants' position are *People v. Jones, supra,* and *Freeman v. State,* 486 P. 2d 967 (Alaska 1971). In *Freeman,* the court merely assumes without analysis that it is "uniformly accepted that psychiatric evidence showing that an individual accused of sexually deviant misconduct is not a sexual psychopath should properly be regarded to be character evidence." *Id.* at 972, n.8.[6]

In *Jones,* the California Supreme Court overturned a trial court refusal to admit psychiatric testimony offered by defendant that he was not a "deviate" and was incapable of forming the intent to have sexual contact with his nine-year-old niece, as charged. The evidence was offered as character evidence that Jones was not a "deviate" and therefore did not commit the acts charged. The court's decision, however, was not based on any evidence of the general acceptance of that sort of psychiatric testimony. Rather, it was based on the California sexual psychopath statutes, Welfare and Institutions Code §§ 5500 to 5521.

Essentially, the court noted that psychiatric testimony had been held competent to determine whether a defendant was a

---

[6]The Alaska court cites several cases in support of this conclusion, but most of these are either not on point or contrary to defendants' position. *See, e.g., Sinnott, supra* (the New Jersey case holding such evidence inadmissible); *State v. Cypher,* 92 *Idaho* 159, 438 *P.2d* 904 (1968) (affirming exclusion of psychiatric character evidence obtained by means of sodium pentothal). The only cases supporting defendants seem to be the California cases, *Jones, supra,* and its progeny.

sexual psychopath and asserted that the sexual psychopath laws represent a legislative conclusion that such persons are more likely than others to commit sexual offenses. The court concluded, therefore, that psychiatric evidence is competent to show that a person does not possess the character of a deviate and consequently did not commit the act charged. New Jersey has a similar statute, *N.J.S.A.* 2C:47–1 to –7,[7] and defendants here make an argument similar to the one accepted in *Jones.*

The New Jersey statute provides that any person convicted of specified sexual crimes is to undergo physical and psychological testing. *N.J.S.A.* 2C:47–1. The results of this examination are to be sent to the trial court. *N.J.S.A.* 2C:47–2. If the examination reveals that the person's conduct "was characterized by a pattern of repetitive, compulsive behavior," the person may be sentenced under this statute, either to specialized treatment for his mental condition at the Adult Diagnostic and Treatment Center or to probation coupled with out-patient psychological treatment. *N.J.S.A.* 2C:47–3. Defendants' argument, essentially, is that if psychological evidence is competent for purposes of applying this statute, as a logical matter it must also be competent as evidence of Cavallo's character.

This argument fails to consider a basic difference in the function of psychological testimony in the two cases and therefore the difference in the inferences said to follow from it. "The purpose of the sex offender act is cure through treatment of the aberrations which caused the sexually deviant offenses rather than punishment." *State v. Clark,* 65 *N.J.* 426, 430 (1974). The Legislature has determined that persons engaged in repetitive, compulsive criminal sexual conduct are amenable to cure, and that psychologists can ascertain which offenders those are. Thus, the expert testimony there seeks to ascertain mental illness (broadly speaking) and amenability to psychological cure.

---

[7]Prior to the comprehensive 1979 changes in New Jersey's criminal statutes, substantially similar provisions were codified at *N.J.S.A.* 2A:164–3 to –13.

Those determinations are recognized as a part of psychological expertise. In contrast, the evidence in this case purports to state the characteristics common to persons who *commit* certain *acts,* rather than suffer from certain illnesses, and to ascertain whether a certain person has those characteristics. The inference is a prediction about the likelihood of having committed certain criminal acts rather than amenability to cure for sickness. As this Court stated in *Sinnott,* refuting the California court's argument in *Jones* :

Furthermore, we believe it is illogical to infer that the enactment of a statute of this sort means the Legislature deemed evidence of lack of deviational traits to be essentially relevant upon the trial of a sex offense. The Legislature evinced a belief that there was a good possibility that a convicted sex offender might be a habitual pervert, but this is a far cry indeed from saying the statute contemplates that lack of deviational traits probably means an accused did not commit a specific and impulsive act of perversion. Obviously, it was recognized that an act against nature might occur without being part of 'a pattern of repetitive, compulsive behavior * * *.' [24 *N.J.* at 428, quoting *N.J.S.A.* 2A:164–5(a)]

Similarly, the other areas in which psychiatric or psychological testimony is generally admitted in evidence are inapposite because such evidence there is admitted for different purposes and in different contexts. Insanity or incapacity to stand trial, for example, represent conclusions about the state of mind of a person. The law determines the standard and the experts seek to ascertain whether the person fits that standard. This is much different from asking experts to ascertain what characteristics non-rapists possess and to testify as to whether defendants have those characteristics.

Likewise, the expert evidence in parole determinations is offered in a quite different context to establish whether there is substantial likelihood that the inmate will commit future crimes, *N.J.S.A.* 30:4–123.53. Unlike a jury trial, in the parole context the evidence is heard by the Parole Board, which routinely makes predictions of the sort required and which has substantial experience evaluating psychiatric testimony. Therefore, such testing can be of reasonable assistance to the factfinder there without the concomitant risk of serious confusion, prejudice and

diversion of attention that is likely to result from its admission in a jury trial.[8]

Defendants have thus failed to persuade us that the proffered evidence has been accepted as reliable by other jurisdictions, or for other purposes in the New Jersey legal system. Defendants therefore have not met their burden under Rule 56 of showing that Dr. Kuris' testimony is based on reasonably reliable scientific premises. *See Hurd, supra; Frye, supra.*[9]

## V

Defendants' final argument is that the exclusion of Dr. Kuris' testimony violates their Sixth Amendment right to "have compulsory process for obtaining witnesses in his favor," *U. S. Const.* amend. VI, as applied to the states through the Fourteenth Amendment. *Chambers v. Mississippi*, 410 *U.S.* 284, 93 *S.Ct.* 1038, 35 *L.Ed.2d* 297 (1973). The United States Supreme Court has in three cases set forth a limited doctrine whereby certain exclusions of evidence proffered by a criminal defendant are found to have so prevented a fair trial as to be unconstitutional, notwithstanding that they are based on generally valid state rules of evidence. *See Green v. Georgia*, 442 *U.S.* 95, 99 *S.Ct.* 2150, 60 *L.Ed.2d* 738 (1979); *Chambers, supra; Washington v. Texas*, 388 *U.S.* 14, 87 *S.Ct.* 1920, 18 *L.Ed.2d* 1019 (1967).

---

[8]As we stated, *supra* at 520, the usefulness of expert testimony depends in part on the context in which it is offered. Testimony may be more helpful than prejudicial in one context, because it is being used for a limited purpose or because the factfinder knows its limitations. Yet in different contexts the same evidence might be excluded as unreliable.

[9]Even if psychiatric testimony of this nature were found to be generally admissible, we would have serious questions about whether the foundation for Dr. Kuris' testimony—only two meetings with Cavallo—is sufficient to support the conclusions drawn about his personality and propensities. *See Sinnott*, 24 *N.J.* at 427–28, in which this Court questioned the sufficiency of two meetings as a basis for expert character testimony. As in *Sinnott*, however, we need not reach this issue.

In *Washington,* the Court spoke of "arbitrary rules that prevent whole categories of defense witnesses from testifying on the basis of a priori categories that presume them unworthy of belief." 388 *U.S.* at 22, 87 *S.Ct.* at 1925. The trial court there had barred the testimony of an accomplice that he, not the defendant, had fired the gun, and that defendant had tried to stop the shooting. The exclusion was based on a rule barring testimony by an accomplice on defendant's behalf.

In *Chambers,* the Court excluded hearsay evidence of repeated, corroborated confessions to close friends that the witness, not the defendant, had committed the murder in question. Mississippi's hearsay rule allowed the admission of declarations against pecuniary, but not penal, interests. The Court held that where there are sufficient indicia of the reliability of testimony "directly affecting the ascertainment of guilt," the hearsay rule "may not be applied mechanistically to defeat the ends of justice." 410 *U.S.* at 302, 93 *S.Ct.* at 1049. The Court concluded by setting forth the limited nature of its holding:

> In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial. [*Id.* at 302–03, 93 *S.Ct.* at 1049]

*Green* was a similar situation. The barred testimony was offered at the sentencing stage of a capital case to show that defendant's accomplice, not defendant, had done the killing, after defendant had left the scene. The evidence offered, a private admission by the accomplice, was barred as hearsay even though it had been offered by the State and admitted in the accomplice's trial. Relying on *Chambers* and *Lockett v. Ohio,* 438 *U.S.* 586, 98 *S.Ct.* 2954, 57 *L.Ed.*2d 973 (1978) (right to submit all mitigation testimony at sentencing hearing before imposition of capital punishment), the Supreme Court held the exclusion unconstitutional.

The facts of these cases underscore the limited nature of the doctrine set forth. In each case, the testimony barred was

*direct* evidence that some person other than defendant had done the shooting. And, in each case, the testimony was either relied on by the State in the conviction of the accomplice or could have been so used, yet was barred as unreliable when offered by the defendant.

The *Chambers* Court made clear that these cases were not meant to give criminal defendants a constitutional right to admit all evidence offered, regardless of the applicable rules of evidence. Rather, they deal with narrow fact situations in which the evidence offered was crucial, direct evidence of guilt or innocence and the exclusion was viewed as arbitrary.

The limited nature of the holdings in these cases is reflected in the way they have been applied in the federal courts. *See, e.g., United States v. Walling*, 486 *F.*2d 229 (9th Cir. 1973), *cert.* den., 415 *U.S.* 923, 94 *S.Ct.* 1427, 39 *L.Ed.*2d 479 (1974) (excluding testimony of accomplice that defendant did not know that the car was stolen); *Maness v. Wainwright*, 512 *F.*2d 88 (5th Cir. 1975), reh. den., 528 *F.*2d 1382 (5th Cir. 1976); *United States v. Wingate*, 520 *F.*2d 309 (2d Cir. 1975), *cert.* den., 423 *U.S.* 1074, 96 *S.Ct.* 858, 47 *L.Ed.*2d 84 (1976) (rejecting defendant's proffer of prior testimony of unavailable witness, stating that *Chambers* applied only where the evidence bears sufficient indicia of reliability). In each case, defendants' argument that the exclusion of evidence at their trial violated the Constitution was rejected.

Application of *R.* 56 to Dr. Kuris' testimony does not violate any constitutional right of defendants. Evidence of a character trait based on an unaccepted scientific premise is not the equivalent of statements by an accomplice or witness in a murder case that he, not the person charged with the murder, had pulled the trigger. Second, the exclusions overruled in *Green, Chambers* and *Washington* resulted from the automatic application of rules of evidence in the face of clear indications that the proffered testimony was reliable. Here, by contrast, the exclusion is based on a determination that the evidence lacks indicia of reliability

and therefore is likely to confuse and divert the jury, rather than inform it. The rule of *Washington* and its progeny was not designed to remove from trial courts, or from the drafters of state evidence rules, their traditional authority to assure the reliability and helpfulness of admitted evidence.

## CONCLUSION

We conclude that defendants have not met their burden of showing that the scientific community generally accepts the existence of identifiable character traits common to rapists. They also have not demonstrated that psychiatrists possess any special ability to discern whether an individual is likely to be a rapist. Until the scientific reliability of this type of evidence is established, it is not admissible.

The judgment of the Appellate Division excluding the evidence is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—7.

*For reversal*—None.